Amalgamated Warbasses Houses Inc. v Elperina (2024 NY Slip Op 50955(U))

[*1]

Amalgamated Warbasses Houses Inc. v Elperina

2024 NY Slip Op 50955(U)

Decided on July 24, 2024

Civil Court Of The City Of New York, Kings County

Weisberg, J.

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and will not be published in the printed Official Reports.

Decided on July 24, 2024
Civil Court of the City of New York, Kings County

Amalgamated Warbasses Houses Inc., Petitioner,

against
Inna Elperina, ET AL., Respondents.

Index No. 310259/2022

Michael L. Weisberg, J.

This is a summary eviction proceeding. The petition alleges that Inna Elperina, the proprietary lessee of the subject Mitchell-Lama cooperative apartment, failed to cure her alleged non-primary residence in and/or sublet of her apartment by February 11, 2022. A bench trial was held at which Petitioner's "security officer," "technician," and assistant property manager testified on behalf of Petitioner. Elperina, the only respondent to appear, testified and did not call any other witnesses. Petitioner's proof contained little, if any, evidence of non-primary residence before service of the notice to cure or subsequent failure to timely cure.
FINDINGS OF FACT
Inna Elperina is the proprietary lessee of 2785 West 5th Street, Apt. 18D, Brooklyn, New York, a state-supervised Mitchell-Lama development owned by Amalgamated Warbasse Houses, Inc. She is also the owner, along with her husband (from whom she claimed she was separated), of a house located in the Mill Basin neighborhood of Brooklyn. There is no dispute that her husband, who was an original member of the official household but is no longer, has lived in the Mill Basin house for many years. Amalgamated attempted to prove that Elperina lived the house as well, instead of her apartment, and that she was subletting her Mitchell-Lama apartment. The court finds that Amalgmated failed to do so.
Amalgamated's first witness, Alexander Sakahyan, is employed as one of eighteen "security officers" for the apartment complex. The complex comprises five buildings, each with approximately 517 apartments, for a total of over 2,500 apartments, spread over almost twenty-seven acres. Among Sakahyhan's duties is to walk around the complex and interact with tenants. As of the date of his testimony, September 6, 2023, Sahakyan testified that he had not seen Elperina at the complex in twelve months. On cross-examination he then testified that he had not seen Elperina at the complex since July 2021. Other than that statement, he did not testify about any observations concerning the allegations for the period before January 18, 2022 (the date of the notice to cure) or as of February 11, 2022 (the date by which Elperina was required to cure). [*2]Considering that there are over 2,500 occupants in the complex, the court gives little weight Sakahyan's testimony.
Sakahyan also undertook an investigation concerning the presence of Elperina's car and Elperina herself at the Mill Basin house. However, that investigation did not start until 2023, a time well after the period that is relevant to Amalgamated's cause of action.
Jason Barrientos is a "technician" employed by Amalgamated. The purpose of his testimony was to lay a foundation for the admission of a compilation of surveillance video that Amalgamated sought to have admitted into evidence. At the time Barrientos began working for Amalgamated, in December 2021, there had already been a "covert" surveillance camera installed facing the doorway of Elperina's apartment. It connects to a digital video recorder that records the door constantly, twenty-four hours per day, seven days per week. Barrientos's job has been to review the recorded footage and see who enters and leaves the apartment.
Barrientos testified that he has not always reviewed all the recorded footage. Though he started working for Amalgamated in December 2021, he testified that "towards the beginning" of his employment there were "weeks of footage" that were never reviewed. Once he started reviewing footage and to the beginning of 2023, he only reviewed footage for about "two to three" weeks out of each month.
Except for 50 hours of footage, from an unspecified period, Barrientos's practice was to reviewed the recording while fast forwarding (otherwise he would be reviewing the recording twenty-four hours per day). While viewing the recording at a heightened speed, Barrientos would look for individuals entering and leaving the apartment. Whenever he saw someone doing so, he would download that portion of the recording. Barrientos then uploaded a compilation of all those portions to a USB drive (one per year). It is these USB drives, with the compiled recorded portions on them, that Amalgamated sought to have admitted into evidence. Elperina objected to the admission of the video. The court reserved decision on their admissibility and had the parties brief the issue.
Phyllis Dugan is Amalgamated's assistant property manager. She formed a belief that Elperina was not using the apartment as her primary residence and/or was subletting but conceded that her belief was based only on "intuition." She offered no evidence that Elperina was not using the apartment as her primary residence, was subletting, or that she failed to cure by February 11, 2022.
DISCUSSION
Admissibility of Compiled Portions of Surveillance Video
"Similar to a photograph, a videotape may be authenticated by the testimony of a witness to the recorded events or of an operator or installer or maintainer of the equipment that the videotape accurately represents the subject matter depicted" (People v Patterson, 93 NY2d 80, 84 [1999]). Under certain circumstances, a compilation of portions of footage from surveillance cameras may be admissible (see People v Cabrera, 137 AD3d 707, 707 [1st Dept 2016]). In Cabrera, the defendant was convicted of burglary in the second degree, in part based on the admission of "a compilation of portions of footage drawn from numerous police surveillance cameras in a Housing Authority building" (id.). "Authentication was provided by a competent police witness, who testified in detail about the videotaping and compilation process. She explained that she viewed several hours of videotape and created a 30-minute disc that included all the footage that was relevant to the case, that is, all views of any persons involved in this case entering and leaving the building" (id.).
There is a key difference between the evidentiary purpose of the video compilation in Cabrera and the video compilation here. In Cabrera, the People used the video to show the defendant's presence in the building. Here, Amalgamated is attempting to use its compilation of video footage as evidence of Elperina's absence. To be sure, as Amalgamated argues, citing People v Ruiz (7 AD3d 737 [2d Dept 2004]), a video recording may be relevant for what it does show and for what it does not show.[FN1]
So in Ruiz security videotapes were properly admitted into evidence to rebut the defendant's claim that he was in the hospital during the time of the robbery. But in Ruiz the videotape recording was the entirety of the recording during the period in question (likely no more than a few hours), not a compilation of segments of footage pulled from the complete recording over the course of multiple years.
The compiled video footage is not admissible. First, as discussed below, Amalgamated's burden is to prove that Elperina was not using the apartment as her primary residence or was subletting before the issuance of the notice cure and that she failed to cure by February 11, 2022. Barrientos admitted that for weeks after he started in December 2021, the footage was never reviewed. That means that there is no video evidence at all from before the notice to cure (dated January 18, 2022) and little or no video evidence from after the notice to cure until February 11, 2022.
Second, even if there were footage from the relevant period (Barrientos also admitted that it was not until 2023 that he even reviewed all the footage), the compiled video footage at issue is different from the compiled footage in Cabrera, in that Amalgamated wants to use it to prove Elperina's absence, not her presence as in Cabrera. It is also unlike the footage used to show absence in Cruz, in that it is compiled and taken from a period of years, instead of complete and covering a discrete period of several hours, like in Cruz. In other words, the footage was effectively altered by Barrientos; the compiled video recordings contain what he testified were the only portions he observed that contained individuals entering and leaving the apartment. Other than his interested testimony, there is no way to know whether the compilations are a complete record of every time someone entered or left the apartment.
Termination of a State-Supervised Mitchell-Lama Tenancy
The regulations for state-supervised Mitchell-Lama are contained in chapter V of subtitle S of title 9 of the New York Code of Rules and Regulations. Section 1727-5.3 of the regulations contains the rules for terminating a Mitchell-Lama tenancy, including the permissible grounds for termination. As relevant here, termination is permitted for violating an obligation of the lease (9 NYCRR 1727-5.3[a][2]) (paragraph 8 of the parties' lease prohibits subletting) and for failing to use the apartment as the tenant's primary residence (§ 1727-5.3[a][12]). In either case, before terminating the tenancy, the tenant must be served a notice to cure (§ 1727-5.3[b][1]). A notice of termination cannot be served "until the time to cure has expired and the violation has not been cured" (§ 1727-5.3[b][2]).
Amalgamated's burden was therefore to prove that Elperina 1) was either subletting or [*3]was not using the apartment as her primary residence; 2) that it served a notice to cure; 3) and that she failed to cure by the date in the notice (Hudson Assoc. v Benoit, 226 AD2d 196, 197 [1st Dept 1996]; see also Mansfield Owners, Inc. v Phillip, 50 Misc 3d 139[A], 2016 NY Slip Op 50148[U] [App Term, 2d Dept, 2d, 11th & 13th Jud Dists 2016]). The only element of the above proven by Amalgamated was service of the notice to cure, which was not disputed by Elperina. Amalgamated cannot prevail because it failed to prove the remaining elements of its cause of action.
CONCLUSION
Amalgamated has failed to prove all the elements of its cause of action in this summary eviction proceeding. Accordingly, it is ORDERED that judgment shall enter in favor of Respondents dismissing the petition.
This is the court's decision and order.
Dated: July 24, 2024
Michael L. Weisberg, JHC

Footnotes

Footnote 1:In citing Ruiz in its memorandum of law, Amalgamated includes a quotation purportedly from the decision: "A video recording may be relevant for what it does not show, as well as for what it does show" (NYSCEF Doc. 30, p. 2). In fact, the quotation does not actually exist. The court assumes counsel's error was a mistake (though one the court cannot comprehend how it was made), but cautions counsel to avoid such errors in the future.